*Attorney Grievance Commission of Maryland v. Gregory Wayne Jones*, AG No. 1, September Term, 2021. Opinion by Biran, J.

**ATTORNEY DISCIPLINE – SANCTION – SUSPENSION STAYED IN FAVOR OF PROBATION –** The Supreme Court of Maryland sanctioned an attorney with a 90-day suspension, stayed in favor of a 12-month probationary period with conditions, for filing a plea in a criminal case without his client's knowledge or consent, failing to act with diligence and competence in two client matters, and charging and retaining unreasonable flat fees. Such conduct violated Maryland Attorneys' Rules of Professional Conduct 19-301.1 (Competence), 19-301.2 (Scope of Representation and Allocation of Authority Between Client and Attorney), 19-301.3 (Diligence), 19-301.4 (Communication), 19-301.15 (Safekeeping of Property), 19-301.16 (Declining or Terminating Representation), and 19-308.4 (Misconduct).

IN THE SUPREME COURT

OF MARYLAND*

AG No. 1

September Term, 2021

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

GREGORY WAYNE JONES

_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Opinion by Biran, J.

_____

Filed: July 12, 2023

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

On March 8, 2021, Petitioner, the Attorney Grievance Commission of Maryland (the "Commission"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action (the "PDRA") alleging that Respondent, Gregory Wayne Jones, violated several of the Maryland Attorneys' Rules of Professional Conduct ("MARPC"). On September 9, 2021, the Commission filed an Amended Petition for Disciplinary or Remedial Action (the "Amended PDRA"), alleging that Mr. Jones violated the following rules:[1] 1.1 (Competence); 1.2 (Scope of Representation and Allocation of Authority Between Client and Attorney); 1.3 (Diligence); 1.4 (Communication); 1.5 (Fees); 1.15 (Safekeeping Property); 1.16 (Declining or Terminating Representation); 8.1 (Bar Admission and Disciplinary Matters);[2] and 8.4 (Misconduct).

This Court designated the Honorable Dana M. Middleton of the Circuit Court for Baltimore City (the "hearing judge") to conduct an evidentiary hearing on the alleged rules violations. That hearing went forward on May 20 and May 23, 2022. On July 7, 2022, the hearing judge issued Findings of Fact and Conclusions of Law, finding by clear and convincing evidence that Mr. Jones violated the MARPC, as alleged by Bar Counsel. As detailed below, we conclude that Mr. Jones violated Rules 1.1, 1.2, 1.3, 1.4, 1.5, 1.15, 1.16,

---

[1] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct, which employed the numbering format of the American Bar Association Model Rules, were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified without substantive modification in Title 19, Chapter 300 of the Maryland Rules. For ease of reference and comparison with our prior opinions and those of other courts, we will refer to the MARPC using the numbering of the model rules, as permitted by Maryland Rule 19-300.1(22).

[2] Following the hearing in this matter, Bar Counsel withdrew the allegation that Mr. Jones violated Rule 8.1.

and 8.4, and determine that a 90-day suspension, stayed in favor of 12 months of probation with conditions, is the appropriate sanction.

I

**The Hearing Judge's Findings of Fact and Conclusions of Law**

**A. Factual Findings**

We summarize here the hearing judge's findings of fact.

*Background*

Mr. Jones was admitted to the Maryland Bar on February 4, 2010. Mr. Jones operates a solo law office in Baltimore City.

*Representation of Rick'kell Johnson*

Rick'kell Johnson hired Mr. Jones to represent him in relation to charges stemming from a traffic stop that occurred on February 6, 2017. Mr. Johnson was charged in the District Court of Maryland in Allegany County with operating an unregistered motor vehicle, unauthorized use of a license plate, and knowingly driving an uninsured vehicle. He received three citations in relation to these traffic violations. Additionally, Mr. Johnson was charged in the District Court with criminal violations, including possession with the intent to distribute a controlled dangerous substance, possession of a controlled dangerous substance – not marijuana, possession of paraphernalia, and obstruction of justice. *State v. Johnson*, Case No. 6W0007646. The District Court scheduled a trial date of March 3, 2017, for the criminal violations and a separate trial date of May 9, 2017, for the traffic violations.

Mr. Johnson retained Mr. Jones on February 23, 2017, seeking representation in both the traffic and criminal matters. Mr. Johnson signed Mr. Jones's "Legal

2

Representation Agreement." This agreement stated that Mr. Johnson was required to pay a "non-refundable engagement fee in the amount of $4,000" before Mr. Jones would begin to "work or enter [his] appearance in the case." The agreement stated that the engagement fee "is earned when received and is non-refundable." The agreement also stated that Mr. Johnson would pay an additional $4,000 flat fee for the representation. According to the terms of the agreement, this flat fee was "fully earned upon receipt." The agreement further stated that the flat fee payments would be placed in Mr. Jones's "Operating Account," rather than his "Escrow Account," and thus would "becom[e] property of [Mr. Jones]." At the outset of the representation, based upon the information that Mr. Jones had received from Mr. Johnson, Mr. Jones incorrectly believed that the traffic offenses were included in the criminal case.

Prior to Mr. Johnson's initial appearance in his criminal case on March 3, 2017, Mr. Johnson had not yet paid any fees to Mr. Jones. For this reason, Mr. Jones did not enter his appearance in the criminal case or appear on Mr. Johnson's behalf at the March 3 hearing. Mr. Johnson appeared *pro se* at the March 3 hearing, and the District Court granted Mr. Johnson's request for a postponement in order to retain an attorney.

Soon afterwards, Mr. Johnson began to make payments toward Mr. Jones's flat fee. On March 7, 2017, Mr. Johnson paid Mr. Jones $300, and on March 24, 2017, he paid Mr. Jones $800. Mr. Jones deposited both of these payments into his operating account. Mr. Johnson then paid an additional $500 on April 28, 2017, bringing his total payment to Mr. Jones to $1,600.

On April 27, 2017, Mr. Johnson's criminal case was transferred to the Circuit Court for Allegany County. An initial hearing was set for June 27, 2017. On May 1, 2017, Mr. Jones contacted the Clerk of the District Court and asked about the status of Mr. Johnson's criminal case. The Clerk incorrectly told Mr. Jones that the criminal case had been dismissed.[3] In fact, the criminal case only appeared closed because it had been transferred to the Circuit Court and assigned a new case number. *See State v. Johnson*, No. 01-K-17-018467. In this May 1 conversation, the Clerk did not mention the traffic charges because they were not part of the criminal case. Mr. Jones incorrectly believed that the traffic and criminal cases had been filed together, so he believed that the traffic case was closed as well, when in fact the trial on the traffic charges remained scheduled for May 9, 2017, in the District Court. Mr. Jones subsequently informed Mr. Johnson that his case had been dismissed.

Due to Mr. Jones's misunderstanding regarding the status of the traffic charges, Mr. Johnson did not appear for the trial in his traffic case on May 9, 2017. The District Court issued a bench warrant for Mr. Johnson's arrest. Mr. Johnson contacted Mr. Jones when he received notice of the warrant, and Mr. Jones promptly filed a motion to recall the warrant. In this motion, Mr. Jones explained that he had misinformed Mr. Johnson and was

---

[3] The hearing judge did not expressly find that the Clerk told Mr. Jones the case had been dismissed, but this is the clear implication of the hearing judge's findings regarding the May 1 conversation between Mr. Jones and the Clerk of the District Court. Moreover, in Mr. Jones's Conditional Diversion Agreement ("CDA"), which we discuss below, Bar Counsel and Mr. Jones agreed that, during his conversation with the Clerk on May 1, 2017, Mr. Jones "was incorrectly informed that the drug charges against [Mr. Johnson] had been dropped." The hearing judge cited this page of the CDA in her Findings of Fact when discussing Mr. Jones's May 1, 2017 conversation with the Clerk.

responsible for Mr. Johnson's failure to appear. On June 22, 2017, the District Court granted the motion and recalled the warrant. The court set a new trial date for the traffic case for September 25, 2017.

This was the first time that Mr. Jones understood that the traffic and criminal cases were separate. After discussing his previous misunderstanding with Mr. Johnson, Mr. Jones was convinced that Mr. Johnson understood that Mr. Jones was only representing him in the criminal case in the Circuit Court. However, Mr. Johnson believed that Mr. Jones was representing him in both the criminal case in the Circuit Court and the traffic case in the District Court.

Meanwhile, Mr. Johnson continued to make payments toward the $4,000 fee. He paid Mr. Jones $500 on June 12, 2017, bringing his total payments to $2,100. Again, Mr. Jones deposited the funds in his operating account. At the June 27, 2017 status hearing in the criminal case, Mr. Jones did not appear because the flat fee still was not paid in full. The circuit court set the next status hearing for October 10, 2017, and scheduled the jury trial for October 11, 2017.

On September 1, 2017, Mr. Johnson paid Mr. Jones the remaining balance for his $4,000 flat fee, which Mr. Jones deposited into his operating account. At the time of that final payment, Mr. Johnson still expected that Mr. Jones would enter his appearance in both the criminal and traffic cases.[4]

---

[4] Although the hearing judge did not state in her findings how the misunderstanding regarding Mr. Jones's representation of Mr. Johnson in the traffic case was resolved, it is undisputed that an Assistant Public Defender entered her appearance on behalf of Mr.

5

On October 2, 2017, Mr. Jones entered his appearance in the criminal case and filed discovery requests. On October 5, 2017, Mr. Jones served a Motion to Compel Discovery and a Request for Continuance based on the State's failure to provide discovery. However, the court did not receive Mr. Jones's continuance request in time for the October 10 status hearing, so no continuance was granted.

Mr. Jones failed to appear at the October 10 hearing due to car trouble. Mr. Jones informed Mr. Johnson and the court that his car had broken down and that he would be unable to travel from Baltimore to Cumberland to attend the hearing. Mr. Johnson appeared on his own at the hearing and requested a postponement, which the court granted. The court postponed Mr. Johnson's trial until November 28, 2017.

After the status hearing, Mr. Johnson expressed dissatisfaction with Mr. Jones's representation and requested a copy of his file, as well as a refund of the $4,000 fee. Mr. Jones declined to refund the fee based on the terms of the Legal Representation Agreement. Mr. Jones also failed to provide Mr. Johnson with a copy of his file. Mr. Jones continued the representation of Mr. Johnson, negotiating a plea agreement with the State's Attorney, which was placed on the record on November 28, 2017. The court accepted the plea agreement and placed Mr. Johnson's case on the stet docket.

On November 9, 2017 (*i.e.*, prior to Mr. Johnson resolving the criminal case with the stet disposition), Mr. Johnson filed a complaint with the Commission, claiming, among other things, that Mr. Jones failed to communicate with him and failed to appear at court

Johnson in the traffic case later in September 2017. On September 25, 2017, the State *nolle prossed* the traffic charges.

6

hearings. Mr. Jones did not receive notice of this complaint until after the November 28, 2017 disposition of Mr. Johnson's case.

*The Conditional Diversion Agreement*

After conducting an investigation, Bar Counsel concluded that a Conditional Diversion Agreement ("CDA") would be the appropriate resolution of Mr. Johnson's allegations of professional misconduct. Mr. Jones, represented by counsel, agreed to enter into a CDA with Bar Counsel. In the CDA, Mr. Jones admitted that, in the course of representing Mr. Johnson, he violated Rules 1.1 (Competence); 1.3 (Diligence); 1.4 (Communication); 1.5 (Fees); 1.7 (Conflict of Interest);[5] 1.15(a) and (c) (Safekeeping Property); 1.16 (Declining or Terminating Representation); and 8.4(a) and (d) (Misconduct).

Under the CDA, Mr. Jones agreed to:

(1) complete a Continuing Legal Education (CLE) course for solo practitioners and a Criminal Law CLE course within six months from the

---

[5] Mr. Jones agreed in the CDA that he violated Rule 1.7 (Conflict of Interest) by modifying the Legal Representation Agreement with Mr. Johnson after he discovered that Mr. Johnson's criminal and traffic cases were separate, *i.e.*, going forward, he agreed to represent Mr. Johnson only in the criminal case. The CDA stated that Mr. Jones "failed to amend the retainer agreement or confirm his understanding in writing, and [Mr. Jones] failed to advise [Mr. Johnson] to seek independent counsel with respect to the modified agreement."

Bar Counsel did not include a charge under Rule 1.7 in either the PDRA or the Amended PDRA. Nor did the hearing judge find that Mr. Jones modified the Legal Representation Agreement after discovering that the criminal and traffic cases were separate. However, as discussed below, the hearing judge concluded that Mr. Jones's failure to delineate the scope of his representation in the Johnson matter violated Rule 1.2.

7

effective date of the CDA.[6] The CLE courses were to be pre-approved by Bar Counsel;

(2) consent to have his law practice monitored by Robert D. Cole, Jr., Esquire, for a period of one year; and

(3) refund a total of $1,000 of his fee to Mr. Johnson as follows: $500 was to be refunded to Mr. Johnson within six months from the effective date of the CDA, and the balance was to be refunded to Mr. Johnson within 12 months from the effective date of the CDA.

On January 25, 2020, Mr. Cole (the "Monitor") submitted his first report to Bar Counsel and provided copies of Mr. Jones's retainer agreements. In his report, the Monitor stated that he intended to work with Mr. Jones to improve his retainer agreements. On January 28, 2020, Bar Counsel requested that the Monitor: (1) inform Mr. Jones that his retainer agreements improperly stated that Mr. Jones's fees were earned upon receipt and non-refundable, in violation of Rules 1.15 and 1.16(d); and (2) direct Mr. Jones to remove that language from his retainer agreements.

On June 1, 2020, a Staff Attorney in the Office of Bar Counsel emailed Mr. Jones regarding his completion of conditions of the CDA and requested: (1) proof of refund in the amount of $500 to Mr. Johnson that was due no later than May 22, 2020; (2) proof of completion of a CLE course for solo practitioners; and (3) proof of completion of a CLE course in criminal law. On June 2, 2020, Mr. Jones responded to the Staff Attorney's email, attaching a photograph of a $500 check issued to Mr. Johnson on May 30, 2020.

---

[6] The CDA did not define an "effective date." However, the CDA recited that it would "remain in effect for a period of one (1) year from the date of its approval by the Commission." The Commission approved the CDA on November 22, 2019. Thus, we conclude that the "effective date" of the CDA was November 22, 2019.

On July 13, 2020, Mr. Jones emailed the Office of Bar Counsel, stating that he was unable to complete the CLE requirements within the required time due to the COVID-19 crisis, the financial crisis, lack of employment, course availability, and cost. However, he explained that he had completed a CLE course on criminal law practice and procedure. He also advised Assistant Bar Counsel that he intended to take a Maryland State Bar Association CLE course in solo law practice management when it was offered.[7]

Later in the day on July 13, 2020, Assistant Bar Counsel emailed a letter to Mr. Jones, stating Bar Counsel's intent to revoke the CDA due to Mr. Jones's failure to amend his retainer agreements as requested and his failure to timely complete the required CLE courses. Bar Counsel invited Mr. Jones "to refute Bar Counsel's determination and/or to offer an explanation or proposed remedy satisfactory to Bar Counsel" in writing by July 24, 2020.

---

[7] Mr. Jones sent this email to Assistant Bar Counsel at 9:30 a.m. on Monday, July 13. Although not a part of the hearing judge's findings of fact, the record reflects that Mr. Jones's July 13 email followed an exchange of correspondence between Assistant Bar Counsel and Mr. Jones's former counsel, William Buie, on Friday, July 10. First, at approximately 4:50 p.m. on July 10, Assistant Bar Counsel informed Mr. Buie that she "need[ed] to send a letter to Mr. Jones regarding his non-compliance with the CDA." Assistant Bar Counsel asked Mr. Buie whether she should send the letter to Mr. Buie or to Mr. Jones directly. At approximately 5:30 p.m. on July 10, Mr. Buie responded that Assistant Bar Counsel should send the letter directly to Mr. Jones, as Mr. Buie was not currently representing Mr. Jones. Mr. Jones emailed Assistant Bar Counsel on the morning of Monday, July 13, prior to Assistant Bar Counsel sending the letter to Mr. Jones that she had indicated on Friday afternoon she was planning to send.

On September 14, 2020, Mr. Jones sent an email to Assistant Bar Counsel attaching a copy of the second $500 payment to Mr. Johnson. Mr. Jones also stated that he was awaiting an opening to take the MSBA Solo Practice Management CLE.[8]

On September 24, 2020, Bar Counsel filed a Petition to Revoke Conditional Diversion Agreement under Maryland Rule 19-716(h). That same day Mr. Jones sent an email to Bar Counsel, to which he attached a revised retainer agreement, and in which he requested clarification about the language Bar Counsel wanted him to modify in the retainer agreement. He wrote:

> Please advise regarding the Rule of Court concerning the Engagement Fee and any relevant case law. I have attempted to seek guidance from Senior Counsel and I have sought clarification, concerning the need to change the agreement. The agreement has been in use for over ten years and is similar to Retainer Agreements used by veteran Criminal Attorneys, within my local community. Please cite so as to avoid confusion, on my part.

Mr. Jones's revised retainer agreement still identified his fee as nonrefundable, fully earned upon receipt, and fully earned when paid.

On September 28, 2020, Mr. Jones emailed Bar Counsel stating that he had substantially complied with the CDA and accusing Bar Counsel of not acting in good faith. He said:

> Please advise regarding the above CLE course, offered by MSBA regarding Solo Practice Management. I have received your PETITION TO REVOKE CONDITIONAL DIVERSION AGREEMENT, but await response from you, regarding the above subject. You sent your PETITION, while I met with

---

[8] The hearing judge noted "that there was no evidence presented that the MSBA Solo Practice CLE course was offered within the timeframe proscribed by the CDA."

10

[the Monitor] and sought clarification from you, on this matter. I received no response.

I forwarded to you, a revised copy of a Retainer Agreement. You failed to acknowledge receipt of this email. On the same date, I met with [the Monitor] and sought clarification from him, as to the specific terms that were of issue. I sent Bar Counsel a copy of a new agreement, but you did not respond, in good faith. Bar Counsel refuses to act in good faith and, instead, filed a Petition to Revoke, as if my actions were not done, in good faith and that I had not substantially performed.

To date, I have, refunded all monies to the client and requested clarification from you, concerning the MSBA course.

I have attempted to perform, pursuant to the agreement and remind you, that there is still a duty of good faith and fair dealing, with respect to any agreement. I have substantially performed, pursuant to the terms of the Agreement and still wish to comply.

Please advise, whether or not, the course meets your approval. Thank you for your response.

On October 2, 2020, Bar Counsel replied and stated, in part:

On September 24, 2020, you provided Bar Counsel with a revised retainer agreement. Your revised retainer agreement still contains improper engagement fee language, improperly states that your flat fee is "fully earned upon receipt," and improperly states that "[i]f the Charges are dismissed or if the prosecution is terminated, the fee is fully earned when paid." This language violates Maryland Rules 19-301.5, 19-301.15, and l9-301.16(d). See also *Att'y Griev. Comm'n v. Kreamer*, 404 Md. 282, 946 A.2d 500 (2008); *Att'y Griev. Comm'n v. Stinson*, 428 Md. 147, 50 A.3d 1222 (2012).

For the reasons set forth above and in the Petition, it is Bar Counsel's position that you remain in material default of the Conditional Diversion Agreement. Pursuant to Maryland Rule 19-716(h), you may file a written response to the Petition with the Attorney Grievance Commission, within 15 days after service of the Petition.

On October 10, 2020, Mr. Jones requested that Bar Counsel withdraw the Petition to Revoke. Mr. Jones set forth a variety of reasons for his inability to timely comply with the terms of the CDA. He also argued that the nonrefundable language in his retainer

11

agreement did not violate the Rules of Professional Conduct. Additionally, Mr. Jones noted that Bar Counsel had previously dismissed an unrelated complaint against him that contained the same retainer agreement language.

On October 22, 2020, the Commission revoked the CDA, lifted the stay of the disciplinary proceeding, and directed Bar Counsel to proceed in accordance with Maryland Rule 19-721.

*Representation of Jada Chambers*

Jada Chambers ("Jada"[9]) was charged in the District Court in Baltimore County with stalking, harassment, making repeated telephone calls, and electronic harassment. These charges stemmed from Jada's alleged violations of the terms of a restraining order involving a California resident named Melissa Conway. Ms. Conway is a radio personality with a nationwide talk show. Ms. Conway sought a restraining order against Jada for online harassment. The Superior Court of California, County of Los Angeles, issued the restraining order against Jada on April 22, 2019. The allegations were that Jada made false accusations of child abuse against Ms. Conway and her partner, that she revealed Ms. Conway's address publicly, revealed the names of her children, and invited the public to go to Ms. Conway's home to have intercourse with her.

After the restraining order's issuance, Jada allegedly violated the order by engaging in additional online harassment. The Los Angeles Police Department notified the Baltimore County Police Department of the restraining order and Ms. Conway's allegations. On

---

[9] Because Jada Chambers and her mother share the same last name, we will refer to them in this opinion by their first names to avoid confusion. We mean no disrespect.

October 25, 2019, Jada was arrested and charged in the District Court with four misdemeanor offenses, as stated above. *State v. Chambers*, Case No. D-08-CR-19-013826. As a condition of pretrial release, Jada was ordered to attend counseling. Her trial date was scheduled for December 19, 2019.

Jada and her mother, Paula Chambers ("Paula"), hired Mr. Jones to represent Jada in connection with the harassment case on November 5, 2019. Paula became involved in retaining an attorney to represent Jada because Paula was going to pay for the attorney's services. Prior to the first meeting among Mr. Jones, Paula, and Jada, Paula understood that, if Mr. Jones was retained, Paula would be obligated to pay a flat fee of $4,000 for the representation, but that she would be permitted to pay this fee in installments. The Legal Representation Agreement that Paula signed provided:

> l. Engagement Fee. Before I begin work or enter my appearance in the case, you must pay a non-refundable engagement fee in the amount of $1,500.00. The engagement fee is to compensate me for my acceptance of this engagement to the exclusion of the other employment. The engagement fee is earned when received and is non-refundable.
>
> 2. Flat Fee. The Flat Fee of $4,000.00 constitutes the fee for representation of client, for the duration of the case, regardless of the nature and extent of services contemplated or rendered, or amount of time actually expended by Attorney. This Flat Fee, which is fully earned upon receipt, will be placed in Attorney's Operating Account and not his Escrow Account, [t]hus becoming property of the Attorney. If the Charges are dismissed or if the prosecution [is] terminated, the fee is fully earned when paid. If attorney's services are terminated by the Client, at any time prior to the completion of the case, the Client will be [c]harged $250.00 for each hour of work performed on the case, with any balance to be refunded to the client.

Paula signed the agreement and paid $2,000 toward Mr. Jones's fee on November 5, 2019, when she and Jada met with Mr. Jones for the first time.

13

Jada received diagnoses[10] on November 12, 2019 and November 14, 2019, from a licensed certified clinical social worker and a psychiatrist, respectively.

Mr. Jones entered his appearance in Jada's case on November 21, 2019. He also filed a Motion for Discovery and Inspection. That motion incorrectly requested information pursuant to Maryland Rule 4-263, which applies to discovery in the Circuit Court, not the District Court.

On November 26, 2019, Paula paid an additional $2,000 toward Mr. Jones's fee. On December 9, 2019, the State filed a criminal information in the Circuit Court for Baltimore County. *State v. Chambers*, Case No. C-03-CR-19-004707. This included the four original charges that had been filed in the District Court and 11 additional criminal charges related to Jada's alleged failure to comply with the April 2019 restraining order.

Jada checked the status of her case on December 11, 2019 through the Maryland Courts' website and learned that her case had been transferred to the Circuit Court. Jada then contacted Mr. Jones, advised him of the Circuit Court case, and asked why the case had been transferred to the Circuit Court. Jada followed up with a text message to Mr. Jones on December 13, 2019. Mr. Jones responded on December 17, 2019, stating:

> Case has been refiled as Criminal Information in the Circuit Court of Maryland for Baltimore County. The District Court case scheduled for 12/19/19, has been canceled and the case forwarded to the Circuit Court. We

---

[10] As we determine that Mr. Jones's conduct violated the MARPC regardless of whether he reasonably believed that Jada had diminished capacity, *see* pages 29-31 below, we do not address the reasonableness of Mr. Jones's belief that Jada had diminished capacity. Accordingly, we endeavor to preserve Jada's privacy to the extent practicable.

14

filed an Entry of Appearance and requested Discovery. Since the case has been sent to the Circuit Court, you will need to await summons and new date.

There are many reasons a case could end up in Circuit Court. The State has elected to drop the charges in the District Court and refiled as a Criminal Information. Basically, the State has decided to refile in the Circuit Court. Nothing else happened except divestment of jurisdiction from District Court to Circuit Court.

On December 21, 2019, Jada and Paula met with Mr. Jones, at which time he informed them that he required an additional fee of $2,000 to represent Jada in the Circuit Court. Mr. Jones said that the Circuit Court case was more complicated, noting the new charges that had been added when the case was refiled in the Circuit Court.

Mr. Jones presented Jada and Paula with a second Legal Representation Agreement, which stated:

1. Engagement Fee. Before I begin work or enter my appearance in the case, you must pay a non-refundable engagement fee in the amount of $750.00. The engagement fee is to compensate me for my acceptance of this engagement to the exclusion of the other employment. The engagement fee is earned when received and is non-refundable.

2. Flat Fee. The Flat Fee of $2,000.00 constitutes the fee for representation of client, for the duration of the case, regardless of the nature and extent of services contemplated or rendered, or amount of time actually expended by Attorney. This Flat Fee, which is fully earned upon receipt, will be placed in Attorney's Operating Account and not his Escrow Account, [t]hus becoming property of the Attorney. If the Charges are dismissed or if the prosecution is terminated, the fee is fully earned when paid. If attorney's services are terminated by the Client, at any time prior to the completion of the case, the Client will be [c]harged $250.00 for each hour of work performed on the case, with any balance to be refunded to the client.

Jada testified that Mr. Jones did not explain the engagement fee and failed to explain that Paula's funds would not be deposited into an attorney trust account. Paula signed the

second agreement and paid the additional $2,000 flat fee in two installments: $500 on December 28, 2019 and $1,500 on January 4, 2020.

Jada received a summons to appear for a January 13, 2020 hearing in the Circuit Court for Baltimore County. On January 7, 2020, Mr. Jones entered his appearance in the Circuit Court and filed a plea of Not Guilty and Not Criminally Responsible ("NCR"). He also filed a Motion for Discovery and Inspection. This motion was deficient in that it was missing Mr. Jones's email address and client protection fund identification number. On January 8, 2020, the circuit court issued a deficiency notice to Mr. Jones with respect to the Motion for Discovery and Inspection. The notice stated that Mr. Jones had 14 days in which to remedy the deficiency.

In the NCR pleading, Mr. Jones asserted:

> [Jada] [was] not criminally responsible because when the alleged crimes were committed [she], due to a mental disability or impairment, lacked substantial capacity to appreciate the criminality of her conduct and thus, was unable to conform, her conduct to the requirements of the law.

Mr. Jones also asserted in the pleading that Jada was incompetent to stand trial. Mr. Jones did not discuss the NCR plea with Jada before filing it with the court.

After Mr. Jones entered his appearance in Jada's case, the January 13 hearing was postponed. On January 8, 2020, Jada checked the status of her case through the Maryland Courts' website and learned of the postponement of the January 13 hearing. Between January 8 and 11, Jada sent numerous text messages to Mr. Jones asking whether she needed to appear for the January 13 hearing. Mr. Jones responded on January 11, 2020: "Apparently it has been cancelled. I will not know, until Monday. I will need to speak with

the Clerk of the Court." Mr. Jones failed to provide any further information to Jada regarding the canceled hearing.

On January 13, 2020, Jada texted Mr. Jones in the morning, informing him that she did not appear at the courthouse, and she again requested additional information regarding the reason for the postponement as well as about the status of the case. On January 16, 2020, having received no response to her January 13 message, Jada sent another message to Mr. Jones. Mr. Jones replied later on January 16:

> Ms. Chambers, please stop sending me so request for information, where I have explained that the process will take time and I will be in contact when information is shared. At this point, allow me to continue to work. I have already shown that I entered and that discovery was sought. I am also filing a plea of not criminally responsible, as I believe that you were not acting out of your own volition, where the State may argue that you may have contacted the complainant. I believe that your history of mental health, should be considered, in light of the nature of the charge and your current diagnosis. We are seeking to have an order for an evaluation, so that you may speak with a professional, who may help to prove that your actions, were impulsive, due to your disability, over which you have no control.

(All sic in original). Contrary to the implication in this text message that Mr. Jones was in the process of filing a plea of not criminally responsible, Mr. Jones had already filed the NCR plea.

Jada responded in part to this text from Mr. Jones: "Do you think they might try to hospitalize me?? Because my issues aren't that severe[.] I'm still receiving outpatient Counseling and going to see a Psychiatrist[.]"

Jada testified that she "Googled" the definition of NCR, because she had never heard of it, and was unaware of its implications. Jada never reviewed the NCR pleadings Mr. Jones filed on her behalf. However, on January 27, 2020, Jada indicated in a text

17

message to Mr. Jones that she was willing to go along with the NCR plea in order to resolve her case.

On January 27, 2020, Mr. Jones's Motion for Discovery and Inspection was stricken because Mr. Jones had failed to correct his deficient filing within the required 14-day window. Jada sent Mr. Jones text messages asking why the filing had been stricken. Mr. Jones did not respond.

In February 2020, Jada and Paula terminated Mr. Jones's representation. Jada first requested "emergency mediation" with Mr. Jones, a file review, and "receipts" for their retainer agreements. On February 19, 2020, Paula wrote Mr. Jones expressing agreement with her daughter's wish to terminate representation. She requested that Mr. Jones provide "the entire contents of our file" as well as "[c]opies of retainer papers" and receipts for checks she had previously provided to Mr. Jones. Mr. Jones did not respond to this letter.

On February 20, 2020, Jada wrote a letter to the Circuit Court for Baltimore County requesting that Mr. Jones's appearance be stricken. She alleged that he neglected her case, made errors in filings, and failed to communicate with her over the previous month.

On February 21, 2020, Jada informed Mr. Jones that she and her mother wished to terminate the attorney-client relationship with Mr. Jones and requested a refund of "any money left from her retainer." Mr. Jones responded later on February 21 and agreed to terminate his representation. He stated that "[t]he fee was earned upon receipt, becoming property of the attorney." He also stated his hourly rate was $250 and that the flat fee had been "exhausted … by way of the countless hours of phone conferences, entry of appearance, drafting time and subsequent hours spent advising you, in preparation for your

18

case." Mr. Jones offered a "partial refund" of $250. He stated he believed this was fair "considering the additional work on the case and the special nature of the case." He continued: "Initially, this case was said to be a simple harassment case. I was not aware of the potential need for mental health services and the additional proceedings required to prove your case. The amount charged was reasonable and the services were being rendered."

In response, Jada wrote:

As we stated in the certified letter I would like for you to hand over my case file and copy of the 2 retainer agreements that we signed. Every client has a right to a copy of their retainer agreements that they signed and their case file. I wasn't aware that my case would have medical expenses involved either because I was never consulted by you first prior to you filing the "Not Criminally Responsible Plea", I knew nothing about that plea and from what I was told every Lawyer needs to consult with their client first and get their approval before they file any plea on their behalf with the court.

Mr. Jones communicated frequently with Jada during the course of his representation of her, usually responding to messages within 24 hours. Mr. Jones and Jada exchanged more than 120 text messages, and they also communicated on weekends.

Mr. Jones moved to strike his appearance on February 26, 2020. After terminating Mr. Jones's representation, Jada obtained representation from the Office of the Public Defender. She subsequently withdrew her NCR plea and eventually tendered an *Alford* plea.[11]

---

[11] Derived from *North Carolina v. Alford*, 400 U.S. 25 (1970), an *Alford* plea occurs when a defendant, while maintaining innocence, agrees to a proffer of stipulated evidence or to an agreed statement of facts that provides a factual basis for a finding of guilt. *See Smith v. State*, 2023 WL 4071729, at *1 n.2 (Md. June 20, 2023); *Franklin v. State*, 470 Md. 154, 168 n.1 (2020).

On February 18, 2020, Jada filed a complaint against Mr. Jones with Bar Counsel. On July 17, 2021, Bar Counsel concluded its investigation in the Chambers matter. The Commission subsequently directed Bar Counsel to file disciplinary charges related to the Chambers matter. On September 9, 2021, Bar Counsel filed the Amended PDRA, which combined the allegations of misconduct relating to the Johnson and Chambers matters.

## B. Conclusions of Law

We summarize here the hearing judge's Conclusions of Law.

### *Relevance of the CDA*

Citing *Attorney Grievance Commission v. Dominguez*, 427 Md. 308 (2012), the hearing judge observed that "when a Respondent signs a Conditional Diversion Agreement, this means that Respondent is acknowledging that they engaged in professional misconduct." Thus, the hearing judge concluded, once Mr. Jones signed his CDA, he acknowledged that he had violated Rules 1.1, 1.3, 1.4, 1.5, 1.7, 1.15, 1.16, and 8.4 in connection with his representation of Mr. Johnson.

### *Rule 1.1 (Competence)*

The hearing judge found that Mr. Jones violated Rule 1.1 in the Johnson matter, based on his admission in the CDA. In addition, the hearing judge concluded that Mr. Jones violated Rule 1.1 in the Chambers matter when he filed the NCR plea without Jada's consent. The hearing judge reasoned: "[Mr. Jones] failed to explain how the NCR plea operated and any possible repercussions the plea could have. Had [Mr. Jones] properly explained the NCR plea to [Jada], [Jada] could have elected another strategy to proceed with the case."

20

The hearing judge concluded that Mr. Jones also violated Rule 1.1 in both the Johnson and Chambers matters when he failed to deposit and maintain unearned fees in his attorney trust account.

*Rule 1.2 (Scope of Representation and Allocation of Authority Between Client and Attorney)*

The hearing judge concluded that Mr. Jones violated Rule 1.2 when he failed to discuss the NCR plea with Jada. The hearing judge reasoned that an "attorney needs the client's permission before entering … a plea[.]" Based on the hearing judge's finding that Mr. Jones "never had communication with [Jada] about entering into a[n] NCR plea," the hearing judge concluded that Mr. Jones violated Rule 1.2.

*Rule 1.3 (Diligence)*

The hearing judge concluded that Mr. Jones violated Rule 1.3 in the Johnson matter, based on his admissions in the CDA. In addition, the hearing judge concluded that Mr. Jones violated Rule 1.3 by failing to investigate the status of Mr. Johnson's pending matters, which "resulted in an inaccurate understanding of the District and Circuit Court matters, and led to confusion on Mr. Johnson's part. As a result, Mr. Johnson appeared in court without representation." The hearing judge also based her conclusion regarding Rule 1.3 on Mr. Jones's erroneous advice to Mr. Johnson that the charges had been dismissed, "which led to a bench warrant being issued for Mr. Johnson."

With respect to the Chambers matter, the hearing judge determined that Mr. Jones violated Rule 1.3 by filing documents without his client protection number. The hearing

judge stated that "this resulted in multiple filings being returned, causing delay and harm to [Jada]."

*Rule 1.4 (Communication)*

The hearing judge concluded that Mr. Jones violated Rule 1.4 in the Johnson matter, based on his admissions in the CDA.

With respect to the Chambers matter, the hearing judge observed that Mr. Jones communicated regularly with Jada, albeit not as frequently or as promptly as Jada wished. Nevertheless, the hearing judge concluded that Mr. Jones violated Rule 1.4 by failing to discuss the NCR plea with Jada before entering that plea on her behalf.

*Rule 1.5 (Fees)*

The hearing judge concluded that Mr. Jones violated Rule 1.5 in the Johnson matter, based on his admissions in the CDA. The hearing judge further determined that Mr. Jones violated Rule 1.5 in the Johnson matter by charging an unreasonable fee of $4,000. The hearing judge stated that the $4,000 fee initially may not have been unreasonable. However, the hearing judge concluded that the fee ultimately was unreasonable, as Mr. Jones did not complete fair services for the fee, leading to the requirement in the CDA that he refund $1,000 to Mr. Johnson.

The hearing judge concluded that Mr. Jones also violated Rule 1.5 in the Chambers matter. The hearing judge reasoned that the fees Mr. Jones charged Jada were unreasonable, "due to the fact that [Mr. Jones] filed a[n] NCR plea" without Jada's knowledge or consent. According to the hearing judge, Jada therefore "was not gaining any value from the services that [Mr. Jones] was paid for."

22

The hearing judge concluded that Mr. Jones also violated Rule 1.5 in the Johnson and Chambers matters, by including language in his retainer agreements obligating the clients to pay a non-refundable "engagement fee." The hearing judge explained that there was no evidence to suggest that Mr. Jones had to decline other work based on his agreement to represent these two clients. The hearing judge concluded that Mr. Jones also violated Rule 1.5 by charging both clients flat fees that were purportedly "fully earned upon receipt."

*Rule 1.15 (Safekeeping Property)*

The hearing judge concluded that Mr. Jones violated Rule 1.15 in the Johnson matter, based on his admissions in the CDA. In addition, the hearing judge determined that Mr. Jones violated Rule 1.15 in both the Johnson and Chambers matters by failing to obtain his clients' informed consent, confirmed in writing, to deposit the flat fees into Mr. Jones's operating account. The hearing judge noted that Mr. Jones's retainer agreement stated:

> By my signature below, knowing that I have the option to request that fees paid for legal representation be placed in Attorney's Escrow Account, rather than Attorney's Operating Account, and drawn from at an hourly rate of $250.00 per hour, I agree instead to the Flat Fee arrangement as described above for services rendered. Funds in the operating account, however, can be attached by creditors, spent by the Attorney or may otherwise be unavailable for immediate refund.

The hearing judge concluded that, "[a]lthough this section of the retainer agreement states where the fees will be placed, and was signed by the clients, there is no evidence that [Mr. Jones] explained the distinction between the operating account and the attorney trust account." The hearing judge implicitly credited the testimony of Jada and Paula, noting that they testified that "[Mr. Jones] never discussed this with them, and neither of them

23

knew the difference between the two." Moreover, the hearing judge observed, there was "no evidence that [Mr. Jones] explained the possible risks and alternatives to the arrangement stated in the retainer agreement."

*Rule 1.16 (Declining or Terminating Representation)*

The hearing judge determined that Mr. Jones violated Rule 1.16 in the Johnson matter, based on his admissions in the CDA. However, the hearing judge noted that Mr. Jones "did eventually pay Mr. Johnson a refund of $1,000.00. While he may have been a little late with his payments to Mr. Johnson, [the hearing judge] found that was due to financial issues caused by COVID-19."

With respect to the Chambers matter, the hearing judge concluded that Mr. Jones violated Rule 1.16 when he failed to provide the case file to Jada upon her request after she terminated Mr. Jones's representation.

*Rule 8.4 (Misconduct)*

The hearing judge concluded that Mr. Jones violated Rule 8.4(a) and (d) in the Johnson matter, based on Mr. Jones's admissions in the CDA. The hearing judge also concluded that Mr. Jones violated Rule 8.4(a) and (d) in both the Johnson and Chambers matters, based on Mr. Jones's violations of other rules of professional conduct in connection with those matters.

The hearing judge found the presence of three aggravating factors by clear and convincing evidence. First, the hearing judge found that Mr. Jones engaged in a pattern of misconduct by his failure to communicate in the Johnson and Chambers matters. Second, the hearing judge found that Mr. Jones committed multiple offenses, as he violated several rules of professional conduct in both the Johnson and Chambers matters. Third, the hearing judge found that Mr. Jones had substantial experience in the practice of law, given that he was admitted to the Maryland Bar in 2010.

The hearing judge found that Bar Counsel failed to establish any other aggravating factors by clear and convincing evidence. With respect to Bar Counsel's contention that Mr. Jones exhibited a selfish or dishonest motive by refusing to refund fees in both matters, the hearing judge observed that Mr. Jones "did eventually pay Mr. Johnson back $1000.00, and offered to pay [Jada] a refund of $250.00." More broadly, the hearing judge found that Bar Counsel "failed to prove that any of the actions by [Mr. Jones], were completed with a dishonest or selfish motive."

The hearing judge also rejected Bar Counsel's contention that Mr. Jones failed to acknowledge the wrongful nature of his conduct. The hearing judge noted that Mr. Jones had admitted to violating several rules of professional conduct in the Johnson matter in the CDA, and that he refunded the required amount to Mr. Johnson. The hearing judge further noted that Mr. Jones took CLE classes and cooperated with his Monitor. According to the hearing judge, Bar Counsel "did nothing to show that [Mr. Jones] did not acknowledge the wrongful nature of his conduct."

*Mitigating Factors*

The hearing judge found that Mr. Jones proved the existence of several mitigating factors by a preponderance of the evidence. First, the hearing judge found that Mr. Jones has received no prior disciplinary sanctions.

Second, the hearing judge found that Mr. Jones suffered personal or emotional problems. Specifically, the hearing judge found that Mr. Jones suffered hardships due to the COVID-19 pandemic, as his practice decreased significantly in volume, and he lost a family member to the disease. The hearing judge also found, among other things, that Mr. Jones "came close to losing his office space" and was "unable to pay the required refund and … CLE classes in a timely manner."

Third, the hearing judge found that Mr. Jones made timely good faith efforts to make restitution or to rectify the consequences of his misconduct. In this regard, the hearing judge found significant that Mr. Jones fully paid Mr. Johnson the $1,000 refund required under the CDA (although the first $500 payment was late). In addition, the hearing judge noted that Mr. Jones followed the advice of his Monitor when attempting to fulfill the CLE obligations under the CDA.

Fourth, the hearing judge found that Mr. Jones demonstrated a cooperative attitude toward the disciplinary proceedings.

Fifth, the hearing judge found that Mr. Jones demonstrated his good character and reputation through character testimony provided by his son, Devonte Jones: "Devonte Jones … testified as to his experiences while working at [Mr. Jones's] firm for 12 years as a legal assistant and paralegal. Devonte testified that [Mr. Jones] is not a thief, nor has he

26

ever embezzled money, and always treats people well. [Mr. Jones] was a positive influence on Devonte's life, and inspired him to pursue a legal career."

## II

## Standard of Review

"This Court has original and complete jurisdiction in an attorney disciplinary proceeding and conducts an independent review of the record. The hearing judge's findings of fact are left undisturbed unless those findings are clearly erroneous. We review the hearing judge's conclusions of law without deference." *Attorney Grievance Comm'n v. Hoerauf*, 469 Md. 179, 207-08 (2020) (cleaned up).

Neither Mr. Jones nor Bar Counsel filed exceptions to the hearing judge's findings of fact and conclusions of law. Although, in the absence of exceptions, we may treat the findings of fact as established, Md. Rule 19-740(b)(2)(A), we have conducted an independent review of the record.

## III

## Violations of the MARPC[12]

*Rule 1.1: Competence*

Rule 1.1 states: "An attorney shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

---

[12] In several instances, the hearing judge concluded that Mr. Jones violated the MARPC with respect to the Johnson matter, based on Mr. Jones's admissions in the CDA. However, the hearing judge did not find that Mr. Jones breached the CDA. Moreover, the hearing judge noted Mr. Jones's efforts to comply with the CDA during the period of time

By failing to investigate Mr. Johnson's pending cases, Mr. Jones demonstrated a lack of "legal knowledge, skill, thoroughness and preparation" that violated Rule 1.1. Mr. Jones's error resulted in him misinforming Mr. Johnson of his case status, thereby causing Mr. Johnson to fail to appear for his District Court trial. As a result, the District Court issued a bench warrant for Mr. Johnson's arrest and his traffic case was delayed. In addition, Mr. Jones's failure to investigate and understand the interplay between Mr.

---

that included the beginning of the COVID-19 pandemic. With respect to the refund to Mr. Johnson, the hearing judge stated: "While he may have been a little late with his payments to Mr. Johnson, this Court found that was due to financial issues caused by COVID-19." In addition, the hearing judge found that Mr. Jones followed the advice of the Monitor in attempting to belatedly complete the CLE courses. Further, the hearing judge found that there was no evidence that the solo practice CLE course was offered during the period of time in which Mr. Jones was supposed to complete it per the CDA.

We conclude that Mr. Jones technically breached the CDA by: (1) making the first required refund payment to Mr. Johnson eight days late (May 30, 2020, versus May 22, 2020); and (2) failing to take the required CLE classes on the schedule to which he agreed in the CDA. We note that, although Bar Counsel's initial notice to Mr. Jones of its intent to declare Mr. Jones in default under the CDA did not refer to the lateness of the first refund payment, the subsequent petition to revoke set forth the facts relating to that payment, and Mr. Jones has never disputed Bar Counsel's contention that the first payment to Mr. Johnson was late. In addition, although Bar Counsel did not rely on Mr. Jones's acts of misconduct in the Chambers matter as a ground upon which to revoke the CDA, our findings in this opinion concerning the Chambers matter make clear that Mr. Jones did, in fact, violate the MARPC during the diversionary period. For all of these reasons, the Commission acted within its authority in revoking the CDA and the stay of the disciplinary or remedial proceeding, and in directing Bar Counsel to file the PDRA under Maryland Rule 19-721. However, we cannot ignore that the COVID-19 pandemic began while Mr. Jones still had more than two months to comply with the conditions of the CDA. Although we could follow the hearing judge's lead and rely on Mr. Jones's admissions in the CDA to conclude that he violated various provisions of the MARPC in connection with the Johnson matter, in these circumstances we choose to conduct an independent review of the record.

Johnson's traffic case and criminal case led to a misunderstanding between Mr. Johnson and Mr. Jones concerning the scope of Mr. Jones's representation.

Mr. Jones also violated Rule 1.1 in the Chambers matter by failing to discuss the NCR plea with Jada before entering it on her behalf. We recognize that, in many instances in which attorneys file NCR pleas on behalf of their clients, the attorneys reasonably believe that they are representing clients who have diminished capacity. Rule 1.14 provides for these situations. Rule 1.14 states, in part, that:

> (a) When a client's capacity to make adequately considered decisions in connection with a representation is diminished whether because of minority, mental impairment or for some other reason, the attorney shall, as far as reasonably possible, maintain a normal client-attorney relationship with the client.

> (b) When the attorney reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial, or other harm unless action is taken and cannot adequately act in the client's own interest, the attorney may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a guardian ad litem, conservator, or guardian.

In this case, Mr. Jones may have believed that Jada had diminished capacity. At oral argument before this Court, he stated: "My background is from social work before becoming an attorney, and then I became a defense attorney. In this situation, I met with clients who I assumed based on meeting with both mother and client, that this person was someone who couldn't appreciate the wrongfulness of their behavior and the criminality." However, we need not address whether Mr. Jones's belief was reasonable, as Mr. Jones's failure to consult with Jada before filing an NCR plea violated Rule 1.1, even if Mr. Jones believed that Jada had diminished capacity.

It is incumbent upon an attorney "as far as reasonably possible" to "maintain a normal client-attorney relationship with the client." Rule 1.14(a). In this case, the hearing judge's findings demonstrate that it was reasonably possible for Mr. Jones to communicate a recommendation for an NCR plea to Jada. Jada understood what an NCR plea was after conducting her own research. She had questions and concerns about the consequences of the plea and feared she might be institutionalized. Most telling, however, is the fact that Mr. Jones did engage in a discussion with Jada about the NCR plea after he filed it. In a text message that Mr. Jones sent to Jada after he had already filed the NCR plea, Mr. Jones wrote: "I am also filing a plea of not criminally responsible, as I believe that you were not acting out of your own volition[.]" Jada replied: "Do you think they might try to hospitalize me?? Because my issues aren't that severe[.] I'm still receiving outpatient Counseling and going to see a Psychiatrist[.]" It is clear from this exchange that Jada was able to engage in a productive conversation with Mr. Jones about the type of plea she should enter. Thus, Mr. Jones could have – and should have – engaged in this kind of conversation with Jada before he filed the NCR plea.

Where, as here, the client has the capacity to understand the implications of an NCR plea, the decision whether to enter such a plea is for the client to make, with the advice of competent counsel. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Johnson*, 988 N.W.2d 399, 419 (Iowa 2023) (emphasizing that "[t]he client is the master of his own fate, and an attorney who cannot be troubled to seek or follow the client's direction should not be practicing law. Attorneys are granted substantial latitude in deciding how to best prosecute or defend a case on their client's behalf, but certain decisions are always retained by the

30

client," and noting that how to plead in a criminal case is "right at the top" of the fairly short list of decisions that are always retained by the client). When an attorney reasonably believes a client has diminished capacity, the attorney should consider ways to effectively communicate with their client; the attorney should not abandon the normal attorney-client relationship when it is reasonably possible to avoid doing so.

Mr. Jones also violated Rule 1.1 in the Chambers matter by filing a paper that did not include his email address or client protection number. After making the deficient filing, Mr. Jones also failed to correct the filing within the required 14-day window, causing his filing to be stricken.

Finally, in both the Johnson and Chambers matters, Mr. Jones violated Rule 1.1 by depositing unearned fees into his attorney trust account. *See Attorney Grievance Comm'n v. Maignan*, 390 Md. 287, 296 (2005) (an attorney's "failure to maintain [client] funds in a proper trust account demonstrates incompetence under M[A]RPC 1.1").[13]

*Rule 1.2 - Scope of Representation*

Rule 1.2(a) provides, in part:

[A]n attorney shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. An attorney may take such action on behalf of the client as is impliedly authorized to carry out the representation. An attorney shall abide by a client's decision whether to settle a matter. In a criminal case, the attorney shall abide by the client's decision,

---

[13] Below, we discuss the improper language in Mr. Jones's retainer agreements declaring the flat fees paid by the clients to be earned upon receipt.

after consultation with the attorney, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

Mr. Jones violated Rule 1.2 in the Chambers matter by entering an NCR plea without Jada's knowledge and consent. This directly violated Rule 1.2's directive that "[i]n a criminal case, the attorney shall abide by the client's decision, after consultation with the attorney, as to a plea to be entered." As stated above, Rule 1.14 sets out the standard for when an attorney may deviate from the bounds of the normal client-attorney relationship due to an attorney's reasonable belief that a client has diminished capacity; that standard was not satisfied in this case. It was reasonably possible for Mr. Jones to communicate with Jada about an NCR plea.

Mr. Jones's failure to consult about the plea is particularly troubling, considering the consequences of an NCR plea. Section 3-112(b) of the Criminal Procedure Article provides that "after a verdict of not criminally responsible, the court shall order the defendant committed to the facility that the Health Department designates for institutional inpatient care or treatment." Mr. Jones failed to inform Jada of this risk prior to Mr. Jones entering this plea, and he never independently informed her of this risk. Jada engaged in her own research and inquired about the consequences of this plea. Although Jada subsequently told Mr. Jones that she approved of the NCR plea, her after-the-fact agreement does not undo the violation of Rule 1.2.

### *Rule 1.3 - Diligence*

Rule 1.3 provides: "An attorney shall act with reasonable diligence and promptness in representing a client." This duty of diligence can be violated, among other ways, "by

failing to advance a client's cause or endeavor; failing to investigate a client's matter; and repeatedly failing to return phone calls, respond to letters, or provide an accounting for earned fees." *Attorney Grievance Comm'n v. Dailey*, 474 Md. 679, 703 (2021) (quoting *Attorney Grievance Comm'n v. Bah*, 468 Md. 179, 208 (2020)).

For the same reasons as discussed above with respect to Rule 1.1, Mr. Jones violated Rule 1.3 in both the Johnson and Chambers matters.

*Rule 1.4 – Communication*

Rule 1.4 provides:

(a) An attorney shall:

> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 19-301.0(f) (1.0), is required by these Rules;

> (2) keep the client reasonably informed about the status of the matter;

> (3) promptly comply with reasonable requests for information; and

> (4) consult with the client about any relevant limitation on the attorney's conduct when the attorney knows that the client expects assistance not permitted by the Maryland Attorneys' Rules of Professional Conduct or other law.

(b) An attorney shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Mr. Jones violated Rule 1.4 in the Chambers matter by entering an NCR plea on Jada's behalf without her informed consent. In addition, the limited information that Mr. Jones provided to Jada about an NCR plea did not include an explanation of its potential consequences, such as the risk of institutionalization.

33

Additionally, in both the Johnson and Chambers matters, Mr. Jones failed to communicate the difference between depositing fees in an attorney's operating account, as opposed to an attorney trust account. Thus, he did not "explain [the] matter to the extent reasonably necessary to permit the client[s] to make informed decisions," thereby also violating Rule 1.4(b).

*Rule 1.5 - Fees*

Rule 1.5(a) provides, in part: "An attorney shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." The rule provides a non-exhaustive list of relevant factors that may be considered in determining a fee's "reasonableness," including:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the attorney;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the attorney or attorneys performing the services; and

(8) whether the fee is fixed or contingent.

*Id.* Furthermore, the rule provides:

> (b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the attorney will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

We begin our discussion of the fees charged by Mr. Jones by distinguishing between two types of client payments: advance payments and general retainers. An advance payment is a payment to an attorney for future services. Such a payment remains the client's property until earned by the attorney. A flat fee, as we discuss below, is a type of advance payment.

A "general retainer" is "a fee paid, apart from any other compensation, to ensure that a lawyer will be available for the client if required." Restatement (Third) of the Law Governing Lawyers § 34 cmt. e (Am. L. Inst. 2000). General retainers, contrary to advance payments, become the attorney's property upon receipt. *See Attorney Grievance Comm'n v. Kreamer*, 404 Md. 282, 296 (2008).

In both the Johnson and Chambers matters, Mr. Jones charged and collected flat fees (advance payments) that were said to be "fully earned upon receipt." In addition, in both matters, Mr. Jones included language in the Legal Representation Agreements that purported to charge the clients nonrefundable "[e]ngagement fee[s]" (general retainers).

**A. The References to "Engagement" Fees in the Legal Representation Agreements**

The hearing judge concluded that Mr. Jones violated Rule 1.5 in the Johnson and Chambers matters by including language in the Legal Representation Agreements that obligated the clients to pay an "[e]ngagement fee." The agreements recited: "Before I begin work or enter my appearance in the case, you must pay a non-refundable engagement fee[.]" In Mr. Johnson's case, the engagement fee was said to be $4,000. In the Chambers matter, the engagement fee in the first agreement was listed as $1,500; the engagement fee in the second agreement was listed as $750. The Legal Representation Agreements further recited that "[t]he engagement fee is to compensate me for my acceptance of this engagement to the exclusion of the other employment. The engagement fee is earned when received and is non-refundable." The hearing judge found that, by including these references to engagement fees in the Legal Representation Agreements, Mr. Jones violated Rule 1.5 because he did not actually forego representing other clients in order to represent these two clients.

With respect to the Johnson matter, although the Legal Representation Agreement purported to charge a total of $8,000, the hearing judge implicitly found that Mr. Jones and Mr. Johnson agreed that Mr. Johnson would only be responsible for the flat fee of $4,000. The hearing judge found that Mr. Jones began to perform under his agreement with Mr. Johnson after Mr. Johnson paid a total of $4,000; the hearing judge did not mention any understanding that Mr. Johnson owed an additional $4,000 to Mr. Jones at that time based on the terms of the agreement. In a letter to Bar Counsel, dated July 13, 2018, Mr. Jones

stated that he only intended to charge the flat fee, not the engagement fee, and that, as a result, he did not require Mr. Johnson to provide any funds to him at their first meeting. Further, in his complaint to Bar Counsel, Mr. Johnson referred to his payments to Mr. Jones totaling $4,000 as payment in full for the representation. Finally, in the CDA, Bar Counsel agreed that Mr. Jones intended to charge Mr. Johnson $4,000 for the representation and that Mr. Johnson understood that the fee for the representation was $4,000.

Based on these facts, we conclude that the inclusion of the engagement fee in Mr. Johnson's Legal Representation Agreement was an error, and that neither Mr. Jones nor Mr. Johnson believed that Mr. Johnson was actually obligated to pay an engagement fee. For this reason, we decline to conclude that Mr. Jones violated Rule 1.5 by including language about an engagement fee in his Legal Representation Agreement with Mr. Johnson.

Similarly, with respect to the Chambers matter, nothing in the record suggests that, despite the references to engagement fees in both Legal Representation Agreements, Jada or Paula understood themselves to be obligated to pay any engagement fee. In the course of the representation, Paula paid a total of $6,000 to Mr. Jones on behalf of her daughter, representing the sum of the two "flat fees" described in the Legal Representation Agreements. Jada and Paula both testified that Mr. Jones did not discuss the "engagement" fees with them, but he did explain the "flat" fees to them to some extent. There is no evidence in the record suggesting that Mr. Jones ever claimed a right to any portion of the engagement fees he included in the two Chambers Legal Representation Agreements.

Accordingly, we also decline to conclude that Mr. Jones violated Rule 1.5 by including the engagement fee language in the Chambers agreements.

To be sure, an attorney violates Rule 1.5(a) not only by charging or collecting an unreasonable fee, but also by making an agreement for an unreasonable fee. If there had been a meeting of the minds between either client and Mr. Jones that the client was obligated to pay an engagement fee, we would need to determine whether the referenced engagement fee was unreasonable. However, the hearing judge made no finding that either client (or Paula in the Chambers matter) understood themselves to have agreed to pay an engagement fee. In these circumstances, we cannot conclude by clear and convincing evidence that Mr. Jones "ma[d]e an agreement" to charge either client an engagement fee.[14]

---

[14] Of course, if an attorney does not intend to charge a particular fee, the attorney should take care not to include it in a fee agreement that is presented to a potential client. Mr. Jones should exercise more care going forward in how he drafts his representation agreements. In addition, we remind Mr. Jones and other Maryland attorneys that they should exercise caution in charging, collecting, and retaining engagement fees. Engagement fees, like all other fees, may need to be refunded to be reasonable. *See Attorney Grievance Comm'n v. Garrett*, 427 Md. 209 (2012) (per curiam) (noting a reasonable fee may become unreasonable if an attorney fails to earn it). This is true even if the attorney states that an engagement fee is "earned upon receipt." *See Attorney Grievance Comm'n v. Stinson*, 428 Md. 147, 183-84 (2012) (concluding that a purportedly nonrefundable engagement fee was unreasonable); *see also In re Mance*, 980 A.2d 1196, 1202 (D.C. 2009) ("Engagement retainers are earned when received, but it may become necessary to refund even a portion of a retainer if the lawyer withdraws or is discharged prematurely." (citing Restatement (Third) of the Law Governing Lawyers § 38 cmt. g (Am. L. Inst. 2000) ("Restatement"))). In order to be reasonable, a general retainer fee must "bear[] a reasonable relationship to the income the lawyer sacrifices or expense the lawyer incurs by accepting it, including such costs as turning away other clients (for reasons of time or due to conflicts of interest), hiring new associates so as to be able to take the client's matter, keeping up with the relevant field, and the like." Restatement § 34 cmt. e.

An attorney who charges an engagement fee must fully disclose the nature of the engagement fee arrangement. "At a minimum, the lawyer should inform the client,

## B. The Flat Fees in the Johnson and Chambers Matters

A flat fee is a type of advance payment that is "intended to compensate a lawyer for all work to be done on a matter or a discrete aspect thereof[.]" Douglas R. Richmond, *Understanding Retainers and Flat Fees*, 34 J. Leg. Prof. 113, 132 (2009) ("Richmond"). As opposed to a client advancing funds from which the attorney will draw upon at an hourly rate, a flat fee fixes the price for a particular task or legal objective, regardless of the number of hours it takes to the complete the task. Thus, a flat fee can be thought of as a risk allocation mechanism. A client who agrees to a flat fee assumes the risk that the amount of work necessary to complete the task will be less than anticipated, in which case the client will end up paying more than they would have paid if they had chosen to proceed

---

preferably in writing, of the time period of the lawyer's availability, that the client will be separately billed for any services subsequently provided, and that the lawyer will treat the payment as the lawyer's property upon receipt." Mont. Comm. on Ethics, Advisory Opinion 080711 (2008).

We advise increased caution when including an engagement fee in a matter involving an unsophisticated client. *See* Restatement § 34 cmt. e ("Engagement-retainer fees agreed to by clients not so experienced should be more closely scrutinized to ensure that they are no greater than is reasonable and that the engagement-retainer fee is not being used to evade the rules requiring a lawyer to return unearned fees[.]"); *see also id.* § 38 cmt. g ("Clients who pay a fee without receiving an explanation ordinarily will assume that they are paying for services, not readiness[.]").

In *Stinson*, we held that a nonrefundable engagement fee of $5,000 was unreasonable when it was paid "for the Attorney's (1) willingness to provide legal advice and services to the Client; (2) ensuring her availability to the Client, and (3) willingness and availability to represent the Client, for reasonable fees, in transactions and litigation." 428 Md. at 183-84. We held "the benefit provided to [the client] in exchange for her payment of a nonrefundable $5,000.00 fee, was nothing more than the ethical obligation imposed on all lawyers when they agree to provide legal services to a client." *Id*. at 184 (internal quotation marks and citation omitted).

with an hourly fee. By contrast, an attorney who agrees to a flat fee assumes the risk that the amount of work necessary to complete the task will be greater than anticipated, in which case the attorney will end up earning less than they would have if they had charged by the hour.

Flat fees can provide benefits to both attorney and client. For many legal engagements, "a flat fee represents lawyers' only realistic chance of being fully compensated for their services, and a reasonable flat fee often benefits the client by fixing the cost of legal services. In some cases, a flat fee may be a client's only means of hiring qualified counsel." Richmond at 133-34 (footnote omitted).

1. Refundability of Flat Fees

The MARPC require an attorney to return unearned portions of an advance fee. *See* Rule 1.5, Comment [4]; *see also* Rule 1.15(c) (requiring client and attorney funds to be kept separate). This Court has previously stated that a "full flat fee is not earned until all the work associated with the fee is completed." *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 360 (2005). As such, it may be necessary for an attorney to refund portions of a flat fee in order to avoid violating Rule 1.5(a) through the retention of unearned fees. An attorney may not contract out of their ethical obligation to charge reasonable fees. Thus, the inclusion of language in a retainer agreement stating that a flat fee is "nonrefundable" or is "fully earned upon receipt" does not eliminate the requirement that the flat fee be reasonable. Put another way, Rule 1.5 may require that an attorney refund part of a flat fee if the work originally contemplated under the retainer agreement is not completed. This is the case even if the client terminates the representation before completion of the work. For

40

this reason, an attorney's characterization in a retainer agreement of a flat fee as "nonrefundable" and/or "earned upon receipt" is misleading and untrue, where it is understood that the attorney will be performing multiple tasks on behalf of the client in the course of the representation. *See In re Sather*, 3 P.3d 403, 413 (Colo. 2000) ("Because fees are always subject to refund under certain conditions, labeling a fee 'non-refundable' misleads the client and may deter a client from exercising their rights to refunds of unearned fees.").

Additionally, we are concerned that purportedly "nonrefundable" flat fees can incentivize certain types of misconduct. *See* Richmond at 132-33 (treating flat fees as non-refundable is "undesirable" because it "arguably enables lawyers to breach their duties of competence and diligence; potentially discourages lawyers from honoring their ethical and fiduciary duties to communicate; facilitates the possible conversion and misappropriation of clients' funds by lawyers; potentially forces clients into needless disputes at times when they may be especially vulnerable; and affords lawyers extortionate negotiating leverage with respect to fees and expenses or other aspects of a representation when clients insist on enforcing their rights"). Situations can, and indeed do, arise "in which a lawyer charges a flat fee, does little or none of the work for which the fee was paid, and then refuses to refund any portion of the fee when the client protests or terminates the engagement." *Id.* at 132.

This Court addressed such a situation in *Attorney Grievance Commission v. Lawson*, 401 Md. 536 (2007), where an attorney charged a client a purportedly nonrefundable $5,000 flat fee to handle litigation through trial, but withdrew his representation prior to

41

trial after the client refused to pay an additional $5,000 fee. *Id.* at 555-56, 559-60. The attorney left the case before performing much of the work originally contemplated by the parties, and he refused to refund any portion of the $5,000 the client had paid in advance. *See id.* at 579-80. This Court held that the attorney violated Rule 1.5(a) by charging a fee that became unreasonable when the attorney retained the fee even though he withdrew without having performed work that justified the fee. *Id.* at 580.

To increase certainty and avoid ethical violations, attorneys, when practicable, should include reasonable milestones in their flat fee agreements. A milestone indicates when an attorney's "interest in portions of the fee becomes fixed, such that they can then withdraw corresponding sums from their trust accounts." Richmond at 132 (internal quotation marks and citations omitted). Reasonable milestones assist both the client and the attorney, as they facilitate a meeting of the minds concerning the point when an attorney's interest in a portion of the fee is earned. Milestones also provide useful data points concerning the amount that should be refunded to a client if the attorney's representation is terminated before the necessary work is completed.

Milestones may not be appropriate in all flat fee agreements, and even when no milestones are used, an attorney may retain a reasonable portion of a flat fee upon termination of the attorney-client relationship. Reasonableness is determined upon consideration of the factors outlined in Rule 1.5(a), along with any other relevant factors. *See* Rule 1.5, Comment [1] (noting the enumerated factors are not exclusive).

We understand that attorneys often include a provision in flat-fee agreements which states that, in the event the attorney's representation is terminated before all work has been

completed, the attorney will use a specified hourly rate to determine how to value the services that the attorney provided prior to termination and thereby calculate how much of the flat fee to refund to the client. For example, the Legal Representation Agreements that Mr. Jones used in the Johnson and Chambers matters stated that, if the client terminated Mr. Jones's services "prior to the completion of the case, the Client will be Charged $250.00 for each hour of work performed on the case, with any balance to be refunded to the client."

We do not favor these sorts of provisions as the sole method of quantifying the amount of a flat fee that may be retained by an attorney in the event of termination prior to the completion of all work. If an agreement calls for a flat fee, it seems incongruous for an attorney post-termination to value their time as if they had been charging by the hour all along, when the point of the agreement was that the attorney would complete the engagement without regard to how many hours it would take to do so.

However, a specified hourly rate may be useful to include in flat-fee agreements, in conjunction with reasonable milestones, as described above. An hourly rate may shed light on the value of the time the attorney spent working on the case between the last met milestone and the date of termination.

As an example, suppose that under the terms of a fee agreement: (1) the total flat fee for a criminal case is $6,000; (2) the milestone provisions are that: (a) the first $1,000 of the fee will be earned on the date that the attorney enters their appearance in the case; (b) the next $1,000 will be earned at the conclusion of the pretrial hearing; (c) the next $1,000 will be earned at the conclusion the motions hearing; (d) the final $3,000 of the fee

will be earned at the conclusion of the trial; and (3) if the client terminates the attorney before all work is completed on the case, the attorney's time spent on the case between milestones will be valued at $300 per hour.

Suppose that the client terminates the attorney's services one week after the motions hearing. By that time, the attorney will have earned $3,000 of the flat fee based on the completion of milestones (a) through (c), and presumably will have transferred a total of $3,000 from the attorney's trust account to the attorney's operating account. Suppose further that, in the week between the conclusion of the motions hearing and the date of termination, the attorney spent three hours preparing for trial. In this scenario, it may well be reasonable for the attorney to refund $2,100 and retain $900 of the remaining $3,000 of client funds in the attorney's trust account. This assumes that the milestones are reasonable,[15] and that a rate of $300 per hour would have been a reasonable rate for this attorney to charge for the attorney's time preparing for trial if the attorney and client had agreed that the attorney would be paid on an hourly basis.[16]

---

[15] Attorneys should not use milestones that unreasonably front-load the earning of fees. Thus, in the above hypothetical, it likely would not be reasonable for the fee agreement to state that $5,000 of the $6,000 fee will be earned at the time the attorney enters their appearance in the case.

[16] It will not be reasonable in every case for an attorney post-termination to take the position that they have earned that portion of the funds remaining in the trust account that correspond to the number of hours worked since the last met milestone, multiplied by the hourly rate specified in the agreement. What constitutes a reasonable refund depends on the particular circumstances of each matter.

2.  Mr. Jones Violated Rule 1.5 in the Johnson and Chambers Matters.

For the reasons discussed above, we conclude that Mr. Jones violated Rule 1.5(a) in the Johnson and Chambers matters by charging what the Legal Representation Agreements described as a flat fee that was "fully earned upon receipt."[17]

Mr. Jones also violated Rule 1.5 in the Chambers matter by failing to refund an appropriate amount of the $6,000 flat fee after the client terminated his services. Mr. Jones's post-termination offer of only a $250 refund out of the $6,000 flat fee was unreasonable.[18] As noted above, the Legal Representation Agreements in the Chambers

---

[17] We do not agree with the hearing judge's conclusion that Mr. Jones failed to "complete fair services for the fee charged to Mr. Johnson." The hearing judge did not find that Mr. Johnson's understanding of the scope of Mr. Jones's representation was correct. Thus, we cannot conclude that Mr. Jones was obligated under the terms of the Legal Representation Agreement to represent Mr. Johnson in the traffic case. With respect to Mr. Johnson's criminal case, Mr. Jones ultimately negotiated a stet docket disposition to which Mr. Johnson agreed. Notwithstanding the refund that Mr. Jones agreed to pay and did pay to Mr. Johnson as part of the CDA, we cannot conclude by clear and convincing evidence that Mr. Jones did not earn the full $4,000 flat fee.

However, by Mr. Jones's own account, after Mr. Johnson expressed his dissatisfaction with Mr. Jones following the October 2017 status hearing and requested a refund of the $4,000 fee, Mr. Jones told Mr. Johnson that "the entire fee would not be refunded, pursuant to the retainer." Perhaps, if Mr. Jones had not taken the position that the full fee had already been earned and therefore was nonrefundable, Mr. Johnson would have opted to terminate Mr. Jones's services, accept a reasonable partial refund, and would have retained other counsel to represent him in the criminal case. This episode illustrates one of the potential problems with purportedly nonrefundable flat fees: they may disincentivize clients from terminating attorneys with whom they are dissatisfied, for fear of losing all the money they have already paid.

[18] The hearing judge concluded that Mr. Jones violated Rule 1.5 in the Chambers matter "due to the fact that [Mr. Jones] filed a[n] NCR plea" without Jada's knowledge or consent. According to the hearing judge, Jada therefore "was not gaining any value from the services that [Mr. Jones] was paid for." Although we agree with the hearing judge that the flat fee of $6,000 turned out to be unreasonable, we do not agree with the hearing

45

matters stated that, upon termination, Mr. Jones would charge Jada and Paula $250 for each hour of work performed, with any balance to be refunded. However, Mr. Jones did not provide an accounting to Jada or Paula showing in detail what services he had provided and how many hours he spent on each task. Instead, he told Jada that the $6,000 fee was exhausted at his hourly rate of $250, based on the time he spent on phone calls, entering his appearance, and drafting motions. Based on this claim, one would expect an accounting that showed Mr. Jones spending at least 24 hours on various tasks in furtherance of the representation, adding up to at least $6,000 worth of Mr. Jones's time, measured at $250 per hour.

On July 29, 2020, in response to Bar Counsel's request for an accounting of the time he spent on the Chambers matter, Mr. Jones sent Bar Counsel that accounting. It showed he performed 12.5 hours of work on Jada's case. In the letter he provided to Bar Counsel with the accounting, Mr. Jones stated:

> My retainer agreement is clear, as a flat fee arrangement. All monies earned, pursuant to the Retainer Agreement, may be used, in the manner, that I see fit, once the agreement is signed or I enter my appearance, in the matter. The funds paid for a flat fee retainer, may be placed in the Business' Operating Account, thus becoming property of the attorney, may be attached, by Creditors or otherwise, spent…. The fees were not unreasonable, considering

---

judge's rationale for that conclusion. Although filing the NCR plea without Jada's knowledge and consent violated other rules, we cannot say that Jada gained no value from Mr. Jones's services. In this regard, it is significant that Jada agreed to the NCR plea after the fact.

As we explain below, the basis for our conclusion that the $6,000 flat fee was unreasonable is that Mr. Jones did not fully earn the fee and offered an unreasonably small refund of $250. The hearing judge did not make findings of fact concerning what an appropriate refund would have been, but as we explain below, the undisputed record allows us to reach a conclusion about that on our own.

the fees charged by other Attorneys within my community and the complexity of the case.

(Paragraph break omitted).

At the evidentiary hearing, Assistant Bar Counsel entered Mr. Jones's accounting into evidence and asked him about it:

Q. And [the accounting] showed that you performed 12.5 hours on Ms. Chambers' case, didn't it?
A. Yes.
Q. And that would equal, at your hourly rate of [$250], $3,125, correct?
A. I assume so.
Q. So, that was how much of the fee you had earned as of the time you were terminated, correct?
A. Yes. Probably, yes.

Given Mr. Jones's admissions at the evidentiary hearing, we conclude that he violated Rule 1.5(a) in the Chambers matter by failing to refund $2,875 to Paula after Jada terminated his services.[19]

3. <u>Mr. Jones Violated Rule 1.5(b) in the Johnson Matter by Failing to Establish the Basis of the Flat Fee.</u>

Mr. Jones also violated Rule 1.5(b) in the Johnson matter. Mr. Jones failed to clearly set forth the scope of his representation either in the Legal Representation Agreement or orally to Mr. Johnson. Mr. Johnson believed that the $4,000 flat fee covered both his separate traffic and criminal cases, while Mr. Jones believed he was representing Mr.

---

[19] Consistent with the guidance we have provided above, even if Mr. Jones had produced an accounting showing that he worked at least 24 hours on Jada's case, we likely would not conclude that Mr. Jones was entitled to retain the full $6,000 flat fee after Jada terminated his services with the case still in progress. However, in light of the record before us, we conclude that a reasonable refund is $2,875. Going forward, Mr. Jones should incorporate reasonable milestones into his flat fee agreements, where it is clear that, in order to earn the full fee, he will be required to complete multiple tasks.

47

Johnson in one case. Mr. Johnson may not have agreed to the flat fee, had the scope of the representation been established from the start.

*Rule 1.15 – Safekeeping Property*

Rule 1.15 states:

(a) An attorney shall hold property of clients or third persons that is in an attorney's possession in connection with representation separate from the attorney's own property. Funds shall be kept in a separate account maintained pursuant to Title 19, Chapter 400 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the attorney and shall be preserved for a period of at least five years after the date the record was created.

….

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, an attorney shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the attorney's own benefit only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, an attorney shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, an attorney shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

**A. Flat Fees and Compliance with Rule 1.15**

Rule 1.15(c) permits advances against unearned fees to be treated as the property of either the lawyer or the client. *Attorney Grievance Comm'n v. Hamilton*, 444 Md. 163, 189 n.24 (2015). "The reasonable client's expectation is that advance payments belong to the client until they are earned by the lawyer and will be initially deposited in trust and

withdrawn by the lawyer as they are earned. If an agreement diverges from this expectation, therefore, the lawyer must disclose those fee terms fully and in a manner that can be reasonably understood by the client." Mont. Comm. on Ethics, Advisory Opinion 080711 (2008). Thus, Rule 1.15's "default position is that, unless the client gives informed consent, the money is to be treated as the property of the client." *Hamilton*, 444 Md. at 189 n.24 (citing Rule 1.15(c) cmt. [3]).

An attorney does not obtain informed consent to the deposit of an advance fee in the attorney's operating account merely by including language in the fee agreement stating that this will occur. *See Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 504 (2002) (attorney violated Rule 1.15 when he deposited client funds into his operating account as opposed to in a trust account, even where the attorney's legal representation agreement permitted such deposits). Nor does a payment of an advance fee become the property of the attorney simply by virtue of the fee agreement stating that the fee will be "earned upon receipt." *See Lawson*, 401 Md. at 552-53, 578-79 (rejecting respondent's argument that the deposit of a flat fee in his operating account did not violate Rule 1.15 because he had earned it by virtue of the fee being described as "non-refundable" and "chargeable" in the fee agreement).

In determining whether a client gave informed consent for an attorney to deposit an advance fee in an operating account, we will closely scrutinize the client's understanding of the agreement, the client's experience, the history and relationship of the attorney and client, the legal services rendered, and all other pertinent circumstances. *See* Mont. Comm. on Ethics, Advisory Opinion 080711 (2008) (stating that, "[a]t a minimum, and unless

49

circumstances dictate otherwise, the client should be informed of the following matters, preferably in writing: [(1)]The specific services that will be provided in exchange for the advance fee payment; [(2)] That the lawyer will treat the advance payment as the lawyer's property upon receipt; [(3)] That the advance payment arrangement has no effect on the client's right to terminate the lawyer client relationship; and [(4)] That the lawyer will have an ethical obligation to refund advance payments to the extent they become unreasonable.").

This exacting scrutiny is warranted because "a fee agreement between lawyer and client is not an ordinary business contract." *Matter of Swartz*, 686 P.2d 1236, 1243 (Ariz. 1984). The legal "profession has both an obligation of public service and duties to clients which transcend ordinary business relationships and prohibit the lawyer from taking advantage of the client." *Id.*

### B. Mr. Jones Violated Rule 1.15(a) in the Johnson and Chambers Matters.

In this case, clear and convincing evidence supports the conclusion that Mr. Jones violated Rule 1.15 with respect to both the Johnson and Chambers matters by failing to obtain informed consent to the deposit of fee payments into Mr. Jones's operating account.

"Informed consent" means "the agreement by a person to a proposed course of conduct after the attorney has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Md. Rule 19-301.0(f). The informed consent must be confirmed in writing.

As to Mr. Johnson, we base our conclusion concerning Rule 1.15 on the undisputed evidence that Mr. Johnson made partial payments toward the $4,000 flat fee over the course

50

of several months, and that Mr. Jones did not enter his appearance on behalf of Mr. Johnson in the criminal case until Mr. Johnson provided the full $4,000 flat fee, more than five months after Mr. Johnson's first partial payment. Mr. Jones deposited all of these partial payments in his operating account.

Our default position is that an attorney may not deposit partial payments toward a flat fee into an operating account and use those funds as the attorney sees fit before it is clear that the attorney will ever perform any services for the client. We do not rule out the possibility that, with the proper disclosure, a client could agree to such an arrangement. However, we find it difficult to believe that a client with an adequate understanding of how trust accounts work, compared with how operating accounts work, would agree that partial payments toward a flat fee should become the property of an attorney, where the attorney has made it clear that they will not work on the case until the flat fee is fully paid. In this type of scenario, we generally will require more than an executed retainer agreement of the kind Mr. Johnson signed before we will conclude that a client gave informed consent to the deposit into an operating account of partial payments toward a flat fee.

Here, there is no evidence in the record that Mr. Jones actually explained the potential consequences to Mr. Johnson of depositing the partial payments into the operating account. Among other things, there is no evidence that Mr. Jones explained to Mr. Johnson what would have become of partial payments made by Mr. Johnson if Mr. Johnson had never been able to pay the full $4,000, and Mr. Jones therefore never did any work on the

case. Thus, we conclude that Mr. Johnson did not give informed consent to the deposit of his partial payments into Mr. Jones's operating account.[20]

With respect to the Chambers matter, we base our conclusion that Mr. Jones violated Rule 1.15 on the hearing judge's crediting of the testimony of Jada and Paula that Mr. Jones never discussed the distinction between the operating account and the trust account with them, and that neither of them "knew the difference between the two." The hearing judge also found that there was "no evidence that [Mr. Jones] explained the possible risks and alternatives to the arrangement stated in the retainer agreement."

In sum, there is clear and convincing evidence in the record that Mr. Jones failed to obtain informed consent from the clients in both matters to deposit advance fee payments into his operating account.

*Rule 1.16 – Declining or Terminating Representation*

Rule 1.16(d) states:

> Upon termination of representation, an attorney shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of another attorney, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The attorney may retain papers related to the client to the extent permitted by other law.

Clear and convincing evidence supports the conclusion that Mr. Jones violated Rule 1.16 in the Chambers matter. As explained above, Mr. Jones failed to issue a reasonable

---

[20] We do not mean to suggest that, if Mr. Johnson had paid the full $4,000 flat fee in one payment prior to Mr. Jones's completion of work on the case, it would have been permissible for Mr. Jones to deposit that payment into his operating account based solely on Mr. Johnson's signing of the Legal Representation Agreement. *See* pages 49-50, above.

refund after Jada and Paula terminated his services. In addition, he failed to provide the case file to Jada, despite her request that he do so.[21]

*Rule 8.4 - Misconduct*

Rule 8.4 provides:

It is professional misconduct for an attorney to:

(a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; [or]

….

(d) engage in conduct that is prejudicial to the administration of justice[.]

Mr. Jones violated Rule 8.4(a) in both the Jones and Chambers matters, as he committed the violations of the MARPC described above. *See, e.g.*, *Attorney Grievance Comm'n v. Sperling*, 472 Md. 561, 608 (2021) ("Rule 8.4(a) makes it a violation to violate another rule of professional conduct.").

Additionally, clear and convincing evidence supports the conclusion that Mr. Jones violated Rule 8.4(d) in both matters. Most notably, Mr. Jones's improper references to "nonrefundable" flat fees in the retainer agreements in both matters, his failure to provide a reasonable refund in the Chambers matter, and his entry of the NCR plea without Jada's knowledge and consent, were prejudicial to the administration of justice and bring the legal profession into disrepute.

---

[21] For the same reasons that we decline to find a violation of Rule 1.5 based on Mr. Jones's pre-CDA retention of the $4,000 fee in the Johnson matter, we decline to conclude that Mr. Jones violated Rule 1.16 at the conclusion of his representation of Mr. Johnson.

# IV

## Aggravating and Mitigating Factors

"[I]n every case, we consider the nature of the ethical duties violated in light of any aggravating or mitigating circumstances." *Attorney Grievance Comm'n v. Brown*, 426 Md. 298, 325 (2012).

In this case, the hearing judge found the following aggravating factors by clear and convincing evidence: (1) pattern of misconduct; (2) multiple offenses; and (3) substantial experience in the practice of law. We agree that there is a pattern of misconduct and that Mr. Jones committed multiple offenses.

While it is a close question, we cannot conclude by clear and convincing evidence that the aggravating factor of substantial experience in the practice of law is present in this case. At the time Mr. Jones was retained by Mr. Johnson and Jada, Mr. Jones had been a member of the Maryland Bar for approximately seven and nine years, respectively. "Courts differ as to the number of years a lawyer needs to have practiced law in order to apply 'substantial experience' as [an] aggravating factor." AM. BAR ASSOC., ANNOTATED STANDARDS FOR IMPOSING LAW. SANCTIONS 481 (Ellyn S. Rosen, 2d ed. 2019); *cf. People v. Goodman*, 334 P.3d 241, 249 (Colo. O.P.D.J. 2014) (noting that 10 years of practice generally qualifies as substantial experience for purposes of the aggravating factor).

While in Maryland we have no express numerical requirement, we typically require a longer period of licensure than Mr. Jones had before we will conclude that an attorney has "substantial" experience in the practice of law for purposes of this aggravating factor. *Compare Attorney Grievance Comm'n v. Coppola*, 419 Md. 370, 378-79, 406-07 (2011)

(finding aggravating factor of substantial experience in the practice of law where the attorney had 19 years of experience when he committed the violations at issue), *and Attorney Grievance Comm'n v. Malone*, 482 Md. 82, 118-19 (2022) (finding aggravating factor of substantial experience in the practice of law when attorney had approximately 14 years of experience when he committed the violations at issue), *with Attorney Grievance Comm'n v. Thompson*, 462 Md. 112, 138 (2018) (finding mitigating factor of inexperience in the practice of law for attorney with approximately five years of experience at the time of misconduct).

The hearing judge found that Bar Counsel did not establish the presence of any other aggravating factors by clear and convincing evidence, including the factors of selfish or dishonest motive and failure to acknowledge the wrongful nature of the conduct. Bar Counsel has not excepted to these conclusions, and we agree that no other aggravating factors are present.

An attorney has the burden of proving a mitigating factor by a preponderance of the evidence. Md. Rule 19-727(c). The hearing judge found that Mr. Jones proved the following mitigating factors: (1) absence of prior attorney discipline; (2) personal or emotional problems; (3) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (4) full and free disclosure to Bar Counsel or cooperative attitude toward the attorney discipline proceedings; and (5) character or reputation.

We agree with the hearing judge that Mr. Jones proved the existence of the above-mentioned factors by a preponderance of the evidence, with the exception of timely good faith efforts to make restitution or to rectify the misconduct's consequences. Neither party

contends Mr. Jones has any other disciplinary violations on his record, and there is evidence in the record confirming the personal problems that Mr. Jones faced at the time of his misconduct. He testified to personal and financial issues that stemmed from the COVID-19 pandemic, including multiple family members contracting COVID-19 and the death of a family member to the disease. The record included a letter from Mr. Jones's Monitor corroborating Mr. Jones's financial struggles. Furthermore, Mr. Jones's inability to strictly comply with the terms of the CDA, including his untimely payment of the first $500 refund installment to Mr. Johnson, and his failure to take two CLE classes in a timely manner, occurred during this period of personal and financial struggles. In addition, Mr. Jones proved his good character as a mitigating factor by a preponderance of the evidence.

However, we cannot conclude that Mr. Jones met his burden to show good faith efforts to make restitution and rectify his misconduct. As discussed above, Mr. Jones owes a refund in the Chambers matter of $2,875. The accounting he produced for Bar Counsel in July 2020 made that plain, but Mr. Jones nevertheless failed to provide any refund to Paula Chambers.

# V

## Sanction

In determining the appropriate sanction for attorney misconduct, this Court has emphasized that the purpose is to "protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession." *Attorney Grievance Comm'n v. Shryock*, 408 Md. 105, 126 (2009). The public "is protected when sanctions are imposed that are commensurate with the nature

56

and gravity of the violations and the intent with which they were committed." *Attorney Grievance Comm'n v. Awuah*, 374 Md. 505, 526 (2003) (internal quotation marks and citation omitted). Additionally, this Court has recognized that "[t]he gravity of misconduct is not measured solely by the number of rules broken but is determined largely by the lawyer's conduct." *Attorney Grievance Comm'n v. Briscoe*, 357 Md. 554, 568 (2000) (internal quotation marks and citations omitted).

Given that this Court has "generally suspended lawyers who for the first time have been found to have violated rules relating to competency," *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 98 (2000), Bar Counsel has recommended a 90-day suspension. Mr. Jones requests a sanction less than a suspension.

Bar Counsel argues that Mr. Jones's misconduct is more serious than the misconduct at issue in *Attorney Grievance Commission v. Walker-Turner*, 428 Md. 214 (2012), and *Attorney Grievance Commission v. Collins*, 469 Md. 134 (2020). In both of those cases, this Court imposed a 60-day suspension. *See Walker-Turner*, 428 Md. at 234-35 (suspending attorney for 60 days for failing to appear for a client's hearing, where the attorney had previously been sanctioned for the same misconduct); *Collins*, 469 Md. at 152-53 (suspending attorney for 60 days where the attorney lacked diligence, failed to communicate with her client, failed to comply with discovery rules, and failed to prepare her client and her client's witness for trial).

Rather, according to Bar Counsel, Mr. Jones's misconduct is more similar to the misconduct in *Attorney Grievance Commission v. Ugwuonye*, 405 Md. 351 (2008), in which this Court imposed a 90-day suspension. In that case, the attorney acted without

competence, failed to diligently represent his clients, and failed to communicate with them in a timely manner. *Id.* at 373-74. In one client matter, the attorney's failure to file an employment discrimination complaint prejudiced the client, whose untimely complaint was dismissed after the expiration of a statute of limitations. In a second client matter, the attorney charged an unreasonable fee that he deposited in his operating account and failed to return unearned fees. *Id.* at 365-67. In *Ugwuonye*, the attorney did not act with a dishonest, deceitful, or fraudulent intent, lacked a prior disciplinary record, made after-the-fact efforts to ameliorate the circumstances that led to a number of his violations, and was cooperative with Bar Counsel throughout the investigation. *Id.* at 375.

We agree with Bar Counsel that this case resembles *Ugwuonye* more than *Walker-Turner* and *Collins*. *Walker-Turner* and *Collins* both involved only one client matter. *Ugwuonye*, like this case, concerned two client matters. In addition, Mr. Jones's misconduct, unlike that of the attorneys in *Walker-Turner* and *Collins*, went beyond issues involving competence, diligence, and communication. As in *Ugwuonye*, Mr. Jones charged an unreasonable fee, improperly deposited unearned fees into his operating account, and failed to return the unearned portion of a fee upon termination of the representation. Also, as in *Ugwuonye*, there is significant mitigation in this case.

Thus, we agree with Bar Counsel that a 90-day suspension is warranted given the seriousness of the rules violations. However, we choose to stay this sanction in favor of a one-year probationary period, given the unique circumstances in this case, including Mr. Jones's substantial, albeit ultimately unsuccessful, efforts to comply with the CDA during the COVID-19 pandemic. *See Attorney Grievance Comm'n v. Kalarestaghi*, 483 Md. 180,

58

246-47 (2023) (staying 60-day suspension in favor of six-month probationary period with conditions, where, in light of all the circumstances, the Court determined that such a disposition could deter future misconduct "without sidelining for an indefinite period an attorney who has no other record of discipline") (internal quotation marks and citation omitted). In this case, we will impose the following conditions of Mr. Jones's period of probation: (1) Mr. Jones shall refund $2,875 to Paula Chambers no later than March 1, 2024; (2) Mr. Jones shall adhere to the MARPC; (3) Bar Counsel shall appoint either Mr. Cole or another qualified attorney to monitor Mr. Jones's practice for the first six months of Mr. Jones's probationary period, at no expense to Mr. Jones; (4) the practice monitor shall report to Bar Counsel and Mr. Jones on a monthly basis during the monitoring period concerning Mr. Jones's compliance with the MARPC; and (5) in the first six months of the probationary period, Mr. Jones shall complete one CLE course on solo law practice management, which shall be pre-approved by Bar Counsel. The probationary period shall begin 30 days from the date this Opinion is issued.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GREGORY WAYNE JONES.**